James Thomas BRANAM *v.* STATE of Arkansas

CR 82-111                                        640 S.W.2d 445

Supreme Court of Arkansas
Opinion delivered October 18, 1982

*William R. Simpson, Jr.,* Public Defender, and *Jeff Rosenzweig,* Deputy Public Defender, by: *Deborah R. Sallings* and *Carolyn P. Baker,* Deputy Public Defenders, for appellant.

*Steve Clark,* Atty. Gen., by: *Matthew Wood Fleming,* Asst. Atty. Gen., for appellee.

ROBERT H. DUDLEY, Justice. Appellant, James Branam, was convicted of murder and sentenced to 30 years in prison. On appeal, he contends that he was arrested and detained without probable cause and that the inculpatory statement taken after his arrest was the result of the exploitation of the illegal arrest and detention. We agree. The Court of Appeals has certified this case to us pursuant to Rule 29 (1) (b).

At the time of the arrest the police had the following information: After midnight on December 20, 1981, Phillip Hammett and John Widener, both white, went to the Regal Executive Lounge, a predominantly black nightclub, at the corner of Main and Roosevelt in Little Rock. Hammett and Widener had drinks with some unidentified black men. Around 2:00 a.m. Hammett, Widener, and three black men left the club in Hammett's car. They drove to a house near the 700 block of Twenty-seventh Street and all five got out of the car. Two of the black men drew guns and demanded money from Hammett and Widener. A struggle followed, Widener escaped, but Hammett was killed.

In addition, the police had arrested two men, Willie Johnson and Murphy Carroll, after connecting them to the murder by comparing the bullets used to shoot Hammett with those used in a prior shooting. The police then began searching for the third black man. Interviews were conducted with John Widener and with six persons who had been in the Regal Executive Lounge on December 20. From those interviews the police obtained the following information: John Widener told the police that the man he talked to in the bar was five feet six inches tall, wore a cheap brown

suit and sunglasses and was relatively dark skinned. He described the other two men as being "rather small." One witness, Mr. Rafter, said the man he saw was twenty-three, dark skinned, had a large curly Afro hair style, a goatee and was wearing a gray and black pin-stripe suit. Witness Clyde Gilmore described him as five feet six inches to five feet seven inches tall, 150 pounds, dark skinned and wearing a brown or beige suit. Witness Dorothy Jackson said the third man was "five feet five inches and a loud mouth." Pamela Holloway, another witness, said the man was five feet five inches tall, thin and had medium curly hair. Carolyn Eddleton and Wanda Robinson could not give a physical description of the third black man. Leon Pigee told the police that "the little black male has a brother who has curly hair and is short, about five feet three inches." He also said that he thought the bigger black male's name was Murphy.

The police began their search for a thin, dark-skinned black male, five feet five inches to five feet seven inches tall, with curly hair and a "loud mouth." On December 30, 1980, ten days later, they talked with Ernest Dodson, who was a former roommate of Murphy Carroll's. During that interview, Dodson, who had not been at the Regal Lounge on December 20th and had no knowledge of the incident, mentioned a man he knew only as "James" but who he knew to have been shot at the Chestnut Bar and Grill who might fit that description. This person, according to Dodson, had visited Carroll's and Dodson's apartment in the past. A detective knew that some months before James Branam had been shot at the Chestnut Bar and Grill. James Branam, the appellant, was then arrested and subsequently gave a confession.

The appellant filed a motion to suppress the confession because it was a result of the exploitation of the illegal arrest. After hearing the evidence outlined above, the trial court denied the motion, ruling that there was probable cause to arrest the appellant. We reverse.

The United States Supreme Court in *Wong Sun* v. *United States*, 371 U.S. 471, 479 (1963) stated:

It is basic that an arrest with or without a warrant must stand upon firmer ground than mere suspicion, [citation omitted] though the arresting officer need not have in hand evidence which would suffice to convict. The quantum of information which constitutes probable cause — evidence which would "warrant a man of reasonable caution in the belief" that a felony has been committed, [citation omitted] must be measured by the facts of the particular case.

In *Coble* v. *State,* 274 Ark. 134, 138, 624 S.W.2d 421, 423 (1981), we stated:

Probable cause exists where the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested. *Brinegar* v. *United States,* 338 U.S. 160 (1949); *Carroll* v. *United States,* 267 U.S. 132 (1925); *McGuire* v. *State,* 265 Ark. 621, 580 S.W.2d 198 (1979).

In the case now before us the police had no evidence to connect the appellant with the murder. The physical descriptions could have fit any number of black males in the area. The height and skin color descrition was vague and even then appellant only generally matches the description of the third man. Appellant is five feet three and one-half inches tall, rather than the five feet five inches to five feet six inches as described by the witnesses. Appellant is a light colored black man rather than a dark skinned one. There was no information that appellant had been in the bar on the night in question or that he was ever identified by anyone as being the third black man who was with Hammett or Widener. The fact that appellant was seen visiting the apartment of Murphy Carroll, a co-defendant, at some time prior to the crime, does not give rise to probable cause.

Because there was no probable cause, the arrest was illegal. *Beck* v. *Ohio,* 379 U.S. 89 (1964). The illegal arrest was at 1:00 p.m. on December 30, 1981. From that time, until 4:40

p.m. when appellant gave an incriminating statement, appellant was given the warnings required by *Miranda* v. *Arizona*, 384 U.S. 436 (1966), interrogated, fingerprinted, photographed, left alone in the interrogation room for about two hours and again given the *Miranda* warnings.

In *Brown* v. *Illinois*, 422 U.S. 590 (1975). the Supreme Court of the United States held that, where there has been an illegal arrest, statements made following that arrest are inadmissible at trial unless it is shown that the statement is so much an act of free will that it is unaffected by the taint of the illegal arrest. Where, as here, there has been a showing that an arrest is illegal, the state must show that the statement was not obtained by exploitation of an illegal arrest. The United States Supreme Court has identified factors to be considered in this determination including the temporal proximity of the arrest and confession, whether there were any intervening circumstances, and, importantly, whether the illegal arrest was purposeful. See *Dunaway* v. *New York*, 442 U.S. 200 (1979); *Brown* v. *Illinois, supra.* If such a showing is not made, the confession cannot be admitted into evidence. This holding was recently affirmed in *Taylor* v. *Alabama*, ___ U.S. ___, 73 L.Ed.2d 314 (1982).

Since the State did not offer evidence to prove that the statement was unaffected by the taint of the illegal arrest, the statement was inadmissible.

Reversed and remanded.